HUGHES, Justice.
Liberty Sign Company, appellee, sued Lee E. Newsom, 2538 Corporation and J. H. Stecker for rent, liquidated damages and attorney’s fees allegedly due under an advertising display sign contract between Liberty and Newsom and assumed by Stecker and 2538 Corporation. Newsom, in the event of judgment against him sought judgment over and against J. H. Stecker and 2538 Corporation. Newsom also filed a third party action in which he sought judgment against Lawrence Schell, doing business as Dallas Neon Sign Company, in which he sought damages in the sum of $15,000.00 for his interference with contractual relations existing between Liberty and Newsom.
Trial was to a jury but the trial court withdrew the case from the jury and rendered judgment for Liberty against New-som, Stecker and 2538 Corporation, jointly and severally for $575.55 rent, $8,157.17 liquidated damages and $2,750.00 attorney’s fees. Newsom was awarded judgment over against Stecker and 2538 Corporation, jointly and severally. A take nothing judgment was rendered in favor of Schell, doing business as Dallas Neon Sign Company.
During the trial Newsom paid into the registry of the court $575.55 for the rent sued for, and Liberty has been paid this amount.
Only Newsom has appealed from the above judgment.
Appellant’s first three points, jointly briefed, are that under the contract between him and Liberty his liability for future rents was abated by the removal of the sign by a third party and the refusal of Liberty to restore the sign constituted a total breach of the contract by Liberty and it, therefore, could not maintain a suit on it.
Appellant’s fourth point is that Liberty, despite the delinquent rent, elected to continue the contract in force and had no right *444 to terminate the contract and claim liquidated damages after the destruction of the display.
We will discuss these four points together.
The parties agree that the facts are not in dispute. We will state them fully but as succinctly as possible. We set out below all the provisions of the contract, wherein Liberty is Lessor and Newsom is Lessee, which the parties deem pertinent.[1]
*445 The original display contract was amended by written agreement dated September 16, 1964, by virtue of which it was agreed that an additional canopy sign would be furnished, installed, and maintained on the roof of the building, that Newsom would pay an additional $350.00 as initial rent, that the monthly rent would be increased from $153.35 to $191.85, and that the monthly rate in default clause would be decreased. At the time the amended agreement was signed, Newsom paid Liberty $357.00.
Liberty furnished and installed one sign on the shopping center parking lot on land not covered by Newsom’s lease but owned and controlled by a Mr. Padgett. Liberty installed the other sign on the outside roof or wall of the restaurant building at a place not covered by Newsom’s lease but owned and controlled by a Mr. Padgett. Liberty made its own arrangements with Mr. Pad-gett and secured his consent to the installation of the signs on the parking lot and exterior wall of the building. Newsom took no part in these negotiations. Newsom had neither possession nor custody of the signs, but they were owned exclusively by Liberty.
Newsom paid Liberty the $191.85 due on October 1, 1964, as well as the $191.85 due on November 1, 1964. The amount due on December 1, 1964, was not paid until January 5, 1965. Newsom did not pay the stipulated monthly amounts due on January 1, February 1, and March 1, 1965. Notwithstanding Newsom’s failure to make these monthly payments when they were due, Liberty was satisfied with Newsom’s credit and chose to continue the contract in effect. Liberty claimed, sued for, recovered, and has been paid by Newsom $191.85, the full contract rent for each of the months of January, February and March, 1965.
In February, 1965, Newsom sold his restaurant to 2538 Corporation, a business wholly owned by J. H. Stecker, under a written contract in which the purchaser agreed to pay Liberty all of the fifty-seven monthly installments then unpaid on the display contract and also agreed not to injure, damage, or destroy and not remove the display signs.
On February 9, 1965, Stecker advised Liberty by letter that he was negotiating with Newsom for the purchase of the restaurant and intended to assume the payments due Liberty under the display contract. In reply Liberty wrote Stecker on February 11, 1965, stating that it required Newsom’s permission for Liberty to deal with Stecker in the matter and Liberty requested that Stecker furnish credit information on his corporation.
Stecker changed the restaurant from a short order business into a steak house, redecorated the leased premises, and began operations about February 16, 1965. Stecker did not consider the sign compatible with his steak house operation and request *446 ed Liberty to make certain alterations in the signs. On or about the 7th day of March, 1965, Jack Brown, the President of Liberty met with Newsom. Brown testified that “the basic thing at the meeting was to let Mr. Newsom know that he was our customer and that he was the man who was on our contract and we were looking to him for payment, and if we were able to negotiate and work out some sort of deal with Mr. Stecker we would still be looking to Mr. Newsom to get the payment.”
On March 11, 1965, Jack Brown of Liberty, wrote James H. Stecker stating, inter alia:
“ * * * Let me try to clarify our position on this contract:
1. * * * Both of these displays are the personal property of Liberty Sign Co.
2. We have been informed that you have entered into a contract with Mr. Lee Newsom to pay the 57 remaining monthly rental payments * * * Liberty Sign Co. has not consented to an assignment of this contract.
3. Liberty Sign Co. is under no obligation to extend credit to anyone for any changes that might be desired of these sign displays.
4. I am enclosing a blank contract form * * * showing that this display is the personal property of Liberty Sign Co. and it cannot be repaired, replaced, altered or any other work done to it by anyone other than Liberty Sign Co.
5. We have submitted you drawings showing suggested alterations to the sign display to be handled in several financial ways. We feel that it is your decision to decide if you want this work done and how you plan to handle the payments. We are agreeable to make any alterations on the sign on a cash basis with the remaining payments of the contract being paid as per the contract.”
On March 11, 1965, Stecker wrote Liberty claiming that Liberty would not cooperate in altering the signs and requesting that the signs be removed by no later than Monday, March 15, 1965.
Stecker’s threat to remove the signs was discussed between the attorneys for Liberty and Newsom and both objected to the removal of the signs. Newsom demanded that Liberty prevent Stecker from moving the signs and suggested that Liberty get an injunction to restrain Stecker from carrying out his threat. Liberty’s attorney was of the opinion that it could not obtain an injunction and he demanded that Newsom prevent removal of the sign by securing an injunction restraining Stecker. Newsom’s attorney insisted it was the duty of Liberty to protect the signs and prevent their removal.
After receiving the March 11, 1965, letter from Stecker, Jack Brown, President of Liberty, told Newsom that Stecker had threatened to take down the signs, and Newsom testified: “Mr. Brown asked me that if I noticed or detected anyone removing the sign that I contact him personally or someone within his organization.” Newsom agreed to notify Liberty if he discovered the signs were being removed. Newsom had nothing to do with operation of the restaurant and Stecker and his 2538 Corporation were acting entirely on their own. Neither Stecker nor 2538 Corporation was an agent, servant, or employee of Newsom. Stecker and 2538 Corporation later abandoned the restaurant in May of 1965.
On March 16, 1965, Durwood D. Crawford wrote Newsom in behalf of Liberty that it had been pointed out to Stecker that “if the sign is removed, Liberty would make claim against you for the default rate in the rental agreement.”
*447 After March 16, 1965, and before the signs were removed, Newsom’s attorney advised Stecker on two or three occasions that Newsom objected to the threatened removal of the signs.
On Sunday, March 21, 1965, Newsom received a telephone call that someone was in the process of removing the signs and he immediately called Liberty and gave them this information. Newsom then drove to the parking center and parked his car across the street from the sign. Oliver, a Vice-President of Liberty, arrived about the same time and spoke to Newsom. Oliver, went across the street, took some pictures, and talked to the man who was dismantling the sign. Newsom remained across the street. Newsom testified: “I was standing there by my car and Mr. Oliver just took over — went on over to take over presumably whatever was to be done, to prevent the sign from being taken down.” Liberty Sign stipulated at the trial as follows:
“1. David Oliver is an employee of Liberty Sign Company and acted in that capacity on the day the signs in question in this law suit were removed from the location where they had been previously placed by the Plaintiff, Liberty Sign Company, and was present at said location and did have a conversation with a man named Verdelle MacWilliams, who was at that time engaged in the process of removing said signs, at which time the only thing the said David Oliver stated to the said Mac-Williams was that he, David Oliver, was employed by Liberty Sign Company and that the signs so being removed belonged to Liberty Sign Company.”
The signs were removed on March 21, 1965, by Lawrence Schell, doing business as Dallas Neon Sign Company, the third party Defendant, and several days later, on March 24,1965, were delivered by Schell to Liberty.
The display contract was in effect on March 25, 1965, when Liberty first attempted to terminate it.
Mr. Jack Brown, President of Liberty Sign Company, testified as follows:
“Q At the time this letter (referring to Liberty’s letter of March 25, 1965) was written you had not attempted to exercise any option to terminate this contract at any time prior to this letter?
A Prior to that, no sir.
Q But it was by this letter that it was endeavored ?
A Yes, sir.”
On March 25, 1965, the attorney for Liberty wrote Newsom that “since the signs have been removed and Liberty has not received the payments due on the signs for the past three months, it has no alternative but to declare the contract in default and the entire amount due as set forth therein. * * * I am enclosing a liquidation statement showing the amount due based on the default provisions in the contract.” A statement attached to this letter claimed rent at the rate of $191.85 “through March, 1965” plus an alleged “amount due under default provision 54 months @ 77% Ünac-crued Rentals (77% x $10,359.90) — $7,977.12' Plus 2% sales tax $171.05 Total Amount Due Liberty Sign Company $8,723.72.”
The signs have never been replaced by Liberty nor has Liberty ever offered to-replace the signs.
Liberty was holding off in exercising its-right to declare the balance of the contract: due as provided in Paragraph D and was. attempting to reach agreement with Stecker on the price and terms of payment on some-modifications he was requesting. Newsom, was continually informed of the delinquent-status of the payments and negotiations: and was told that Liberty was still holding-him responsible because its contract was. with him. When Stecker could not reach *448 agreement with Liberty on the modifications he advised that he would take down the sign. Newsom was informed of this and discussion was had between the attorneys for Newsom and Liberty. Newsom was told that if the sign came down Liberty would declare the contract terminated as provided in Paragraph D of the Rental Agreement, and the liquidated damages due. This was stated verbally and in the letter written on March 16th, some four or five days before the sign was removed. Newsom and his attorney said they were going to do nothing to prevent the removal. Newsom did not take any legal action to prevent removal. Neither did Liberty.
The rents due under the lease were payable monthly in advance.
We must, in view of the above facts and circumstances, determine the rights of the parties under the lease agreement. Appellant would have us give priority and conclusive effect to Section 5 of the contract which provides that rent should abate during the period the display was out of service in the event it was destroyed or substantially damaged from any cause except the deliberate act of lessee or his agents.
Appellee, on the other hand, would have us give priority and conclusive effect to paragraph D of the contract which provides that if lessee should default in the payment of rents Lessor “may, at its option” terminate the agreement, remove the sign and recover liquidated damages from the lessee.
It is our opinion that Liberty lost the right to exercise its option to terminate the lease for nonpayment of rents when it breached its agreement to rebuild the display in the event of its destruction.
We believe that the following rule quoted in Federal Sign Co. of Texas v. Fort Worth Motors, 314 S.W.2d 878, Tex.Civ.App., Fort Worth, n. w. h., is applicable here:
“Where one party seeks to enforce performance of a contract or to recover damages for a breach thereof, and the. contract contains mutual covenants or requires him to do an act to entitle him to the action, he cannot maintain such action without alleging and proving performance or tender of performance on his part, unless such performance has been excused.”
The lease agreement, despite the default in the payment of rents, was in full force and effect and Newsom was liable for the rents in full as they accrued since Liberty had not exercised its option to terminate the lease when, on March 21, 1965, the display signs were removed. This was a total breach of the lease agreement by Liberty and under Section 5 of the lease all rent was abated until the display signs were restored. As they were never restored, the rents were permanently abated.
It is also our opinion that Liberty waived its right to terminate the contract for nonpayment of rents for the months of January, February and March, 1965, by its action, conclusive in nature, in demanding and receiving full rent for those months rather than a much smaller amount which it would have been entitled to receive in the form of liquidated damages after termination of the contract.
The law we rely upon here is stated in 17 Am.Jur.2d, Contracts, Sec. 447, p. 908, as follows:
“There is no doubt that a default in the performance of a contract may be waived. The right to treat a repudiation as a total breach may be waived. The right to refuse to perform further or to accept further performance and to maintain immediately an action for damages because of a material or total breach may be waived, and the injured party may accept or insist on performance after such breach of the contract. Where there has been a material breach which does not indicate an intention to *449 repudiate the remainder of the contract, the injured party has an election of continuing performance, or of ceasing to perform, or of repudiating the contract. Any act by the injured party indicating an intent to continue will operate as a conclusive election, not depriving him of his right of action for the breach which has already taken place, but depriving him of any excuse for ceasing performance on his own part. Under ordinary circumstances where there is an existing actual breach of contract of a character going to the essence, the innocent party will, if he insists on performance notwithstanding the breach, keep alive his own obligation to continue with performance, with the result that the party at fault, even though having in the interval done nothing in reliance on a continuance of performance, may, if he sees fit, turn about and hold the innocent party to performance. In other words, a party may waive a breach by the other party and then be liable for his own subsequent breach.”
These rules are applied in Western Irrigation Co. v. Reeves County Land Co., 233 S.W.2d 599, Tex.Civ.App., El Paso, n. w. h.
By claiming and accepting the full rents for the months of January, February and March, Liberty waived its right to use nonpayments of these rents as a basis for termination of the lease and its right to invoke the liquidated damages provision of the lease.
Liberty argues that the breach of the lease by Newsom, the nonpayment of rents when due was a continuing breach which gave it the right at any time to terminate the lease and invoke the provision for liquidated damages.
As indicated, Liberty cannot take advantage of this rule, valid though it may be, for two reasons: (1) Its own breach of the contract intervened before it attempted to exercise its option to terminate the lease (2) It waived the right to terminate the lease by claiming and accepting 100% of the delinquent rents, rather than a smaller sum to which it would have been entitled as liquidated damages upon termination of the lease.
The remaining points in the brief of Newsom relate to the amount of liquidated damages and attorney’s fees which were awarded. Under the decision reached by us only the amount of attorney’s fees need be noticed. The trial court allowed attorney’s fees which may total $2750.00. This sum was based on the judgment rendered below.
Since Liberty has recovered only $575.55, reasonable attorney’s fees as provided for in the lease agreement should be reevaluated. For this purpose, we are required to reverse and remand this case.
We affirm the judgment of the trial court insofar as it rendered a take nothing judgment against appellant Newsom and in favor of Lawrence Schell doing business as Dallas Neon Sign Company.
We otherwise reverse the judgment rendered below and remand this case for further proceedings consistent with the opinion.
Affirmed in part, in part reversed and remanded.

•. “Lease:
1 Lessor shall, to Lessee’s special order and specifically for Lessee’s use, construct, install and, during the term of this Agreement, maintain for and lease to Lessee an advertising display (s) described in the specifications and hereinafter called ‘Display’ at (installation address) 1030 Preston Royal Plaza, City Dallas, State of Texas.
Damage or Destruction of Display:
5 In the event Display is destroyed or substantially damaged from any cause except deliberate act of Lessee or his agents, Lessor will, upon notification of such damage by Lessee, rebuild Display to conform to its original specifications. If restoration of the premises where Display is located is necessary, Lessee shall, within thirty days after notification of such requirement by Lessor, provide Lessor with written assurance that restoration will be promptly made, or that Lessee will, within six months, provide another suitable location for Display and pay, as a separate charge, all costs involved in the removal of Display to and its installation at such new location. If written assurance of Lessee is so required, but not given, this Agreement shall terminate as of the date the damage occurred, and any rent accruing after such date and paid by Lessee shall be refunded. Unless this Agreement is thus terminated, rent shall abate during the period Display is out of service and the term of this Agreement shall be extended for a period equal to such period of no service, and rent shall be payable during such extended term.
8 This Agreement consists of the provisions hereof and the attached specifications, rental terms and conditions and the maintenance provisions and constitutes the entire understanding between the parties. This Agreement does not become binding upon Lessor until accepted by Lessor and by an executive officer.
DELIVERY AND PERFORMANCE
A Lessor shall use due diligence in furnishing, installing and maintaining Display, but the performance of Lessor under this Agreement shall be subject to any delay resulting from strikes, breakage, fire, labor disputes, unforeseen commercial delays, war, act of God, or other causes beyond control of Lessor. MAINTENANCE OF DISPLAY
B Lessor, at its expense, shall maintain Display in good condition and appearance. If Display fails to operate for any reason except through fault of Lessee’s agents or employees, Lessor shall, upon notice in writing by Lessee, repair Display within forty-eight hours of receipt of such notice. If Lessor fails, except for reasons beyond its control, to repair Display within such time period, Lessee shall receive credit for the actual time of no service in excess of forty-eight hours, using the maintenance portion of the rental as the basis of such credit. This provision is not intended to reflect the standard of service intended by Lessor, but only to establish, under the above circumstances, an equitable adjustment between Lessor and Lessee.
DEFAULT
D If Lessee shall default in payment of the rental herein provided for, Lessor may, at its option and without demand or notice, terminate this Agreement and remove the display at Lessee’s expense. In such event, the unpaid rent for the unexpired portion or period of this Agreement shall become immediaüey due and payable. Lessee agrees to pay Lessor all such rents and any other amounts due Lessor, less of unaecrued rentals, which amount Lessee agrees constitutes the actual liquidated damages Lessor shall sustain by reason of Lessee’s default hereunder and that same is not a penalty. Lessee further agrees to pay Lessor the reasonable cost, including, but not limited to, attorney’s fees incurred by Lessor in collecting
*445 any monies that shall accrue under the terms of this Agreement. E2 Lessee shall be responsible for securing and maintaining in force all necessary permits from the owner of the premises upon which Display is to be installed, and for all other private permissions necessary for the maintenance, use and existence of Display. Lessee will also be responsible that public permits, once issued, shall not be revoked. Lessor shall not be obligated to commence construction of Display until public permits have been issued. If public permits are denied after every reasonable effort by both parties to secure same, then this Agreement shall terminate without liability to either party. E3 Display, for all purposes, shall be deemed personal property and shall not, by reason of attachment to realty be deemed a fixture or appurtenance thereto, and shall remain severable therefrom and the sole property of Lessor. Without prior written consent of Lessor, Lessee shall not, at any time or at any location, permit Display to be repaired, replaced, altered or other work to be done on Display by any one other than Lessee or Lessor’s agent.”